Our second case is 24-4620 United States v. Russell. Mr. Burnham. May it please the court. Charles Burnham on behalf of Appellant Trent Russell and it's my pleasure to be here with you, honors, this morning at this distinguished law school. There are three issues before the court in this appeal. I'm happy to take direction from the court, but outside of that, I'll take the issues in the order they're presented in the briefs, starting with the district court's denial of the defense. And is that the order they're presented in the briefs? Is that the order you think is of most importance? Like you think your strongest argument is the first one in your brief and your least strong argument is the last one in your brief? Not necessarily, your honor. I think they're all important. I would say probably the first two are quite critical, not to diminish the third, but those are the two I thought, your honors, might be interested to hear about. I'm happy to start. The third is the hearsay issue? That's correct, your honor. Not that I want to shortchange that one. But you had a trial here for the purposes of the students. You had a trial of your client. Yes, your honor. That's right. And he was convicted. You're saying there was bad hearsay evidence. Yes, your honor. Go ahead. That issue is a little more straightforward, just as important, a little more straightforward. The first two, I think, are legally a little more complicated. So I'll start with those. I'm happy to talk about the hearsay issue. As we set forth in our briefs, what we alleged in the trial court below is that the FBI engaged in coercive police activity. By the way, we characterized it really to hijack the enormous of the authority of the defendant's employer and indeed the CEO to engage in a form of. So your argument is that the coerciveness of the interview was as a result of the CEO of the company being present for the interview. Is that correct? That's part of it. That's also the means by which it was set up. The CEO contacted, it wasn't clear if it was a CEO, but someone from the company contacted Mr. Russell and instructed him to be there at a particular time. So the authority of the employer was made use of to get him to come to the interview. But then also the CEO being there was obviously quite critical. You're claiming all of this violated the due process clause of the Fifth Amendment. Yes, your honor. That was involuntary interview with the FBI. Absolutely, your honor. Did law enforcement ask the CEO to be there? They claimed that they didn't, but we don't- Well, is there somewhere in the record that indicates that they did? Not directly, your honor. I certainly attacked the credibility of that answer. The judge credited it, so that's a fact. But I would come at that this way. When you say the judge credited it, so that's a fact, you mean it's a fact that law enforcement did not ask the CEO to be present for the interview? Correct, your honor. And he was convicted of accessing the medical records of a justice on the Supreme Court of the United States. That's correct, your honor. Justice Ginsburg. That was the conviction, and that's what that interview was about. Yes, correct, your honor. He said he denied it and said his cat must have walked across the keyboard. That was one of many statements he said that he could have been... He denied doing it. He denied being the one to access it. He might have denied his cat. We think... Accessing the records of Justice Ginsburg was blamed on his cat. And he said there might have been someone else using his login, and he thought it could have been human error, were the other two things that he said. Those go more to the merits than the suppression issue, but that is part of the record in this case. As to the significance of the CEO, even if we assume, as the court certainly will, that she requested to be there, her presence is nonetheless highly significant for two reasons. His boss sent in the interview. That's what your point is. I'm sorry, what was the first? The boss. His boss sent in with the FBI. Exactly, your honor. He said it was the CEO of the company. Exactly, your honor. I think we all should put ourselves in the shoes of a 29-year-old who had a lot of life experience, but very modest academic credentials. That job was a step up from being a fireman, more money. Imagine yourself being that 29-year-old, walking into a room, you have no idea what's coming, and walking in and seeing the FBI, and you're the CEO of the company from whom there's no higher authority to appeal. Somebody had accessed Justice Ginsburg's medical records at Washington Hospital Center. Well, at George Washington Hospital. Never time to figure out whether it was this fella. Correct, your honor. And his computer had, but he said it was his cat. Well, as I said before, there were a lot of things. That was his explanation. Well, here's, I think, your honor's question is a good one, because it gets to why this interview was so significant. We all know the FBI does not record interviews. They never have, or very infrequently. And so they use the employer to make this interview happen. They may not have ever happened if they'd done it a different way. There's no evidence they used the employer. Well, I think there is, your honor, respectfully. I think she sat in, and you argue that was intimidating. But yes, that's the issue made up after the fact. Did the employer ask any questions during the, or say anything during the interview? There's no details on that in the record. So no? No, your honor. I thought she did muse about how a computer could be used to this effect. In fact, suggesting that there might not be anything to this. Do I have that wrong? I'm sorry, I'm not, didn't fully hear the question. No, I thought that she sort of just made a statement about, more out of curiosity, that she wasn't sure how anyone could do this kind of thing, given the facts that have been, that she understood them to be. That might've been from the trial test of the CEO, and testify at trial, that might be where that came from. Okay. I'm not sure if that was during the interview. All right. Well, let's talk then about the interview, because you raise not an illegitimate concern about having someone's employer in the room at the time that your client was being questioned. But at bottom, he wasn't required to be there, right? It was a voluntary interview. He could have walked away, didn't have to show up, right? That's correct, your honor. Okay. So there were no weapons displayed, right? Nothing in the record about that? That's correct. No handcuffs? Certainly. All right. Did anyone make a statement threatening your client with losing his job if he didn't comply? Absolutely not, your honor. Okay. The interview took place in a conference room, and there was one door unlocked, as I understand it. Is that right? Yes, your honor. So what is it about this, other than the fact that his employer was there, that makes this so coercive as to amount to a constitutional violation? Because of the obvious implications to his livelihood, that any reasonable person we submit in his circumstances would have immediately drawn. But that would have been the case whether or not his boss would have been there or not. I mean, the allegation was that he used his job and the computer access related to that job to access a sitting Supreme Court justices medical file. Any reasonable person would have understood that this might cause some problems with my job. Well, that's a separate inquiry. Whether it's the facts of the substance of the offense is a distinct inquiry towards the voluntariness of the interview. Do you, don't you agree that the totality of the circumstances is what we look at here? Yes, your honor. So how could everything that Chief Judge Diaz just laid out be a separate consideration when we look at the totality of the circumstances? For two reasons, your honor. The analysis is different in sort of a white-collar case than it is in the case involving, you know, street investigations where most of the case law comes from about locked doors and handcuffs and stuff. And you're saying this is sort of a white-collar case? It was a white-collar setting of professional people, CEOs, organ transplant coordinators in an office. It wasn't some robbery suspect like in Giddens. So less threatening or coercive of an environment. Right. It's, it's less, it's less about he was afraid. He thought he was arrested. This isn't like he thought he was in custody. This was, the coercion was a much more subtle. And I don't walk away from that because the Supreme Court's case is explicitly warned about the subtle methods that the courts have to be aware of. And so the coercion here is not scaring him. It's not punching him in the face or something. It was in, in so many words, but without words, but very loudly communicating to him. I think I would understand that better if, if it wasn't for the voluntary nature of the interview. This wasn't an involuntary thing. He could have left. Well, so could the, so could the defendant in Giddens who the facts were pretty, pretty clear in that case could have left, but there were implications that if he was going to leave, he wasn't going to get his car back, which is certainly a very important means of livelihood as this court recognized to many people. You said you had a second point. The first one was the white collar-ish nature of the sentence. Thank you. Thank you for bringing me back to that. The real important point is not only that the judge got the totality of the circumstances wrong, but that the judge, we think, applied an incorrect rule of law that implied economic coercion had to be explicit. And that didn't come from nowhere. Judge Nachmanoff understood that he needed to examine the totality of the circumstances and he said so. But that's part of the ruling. And he analyzed the totality of the circumstances and ruled against you. Well, I think he analyzed it with ruling out of court certain critical things. I think it's critical to understand Judge Nachmanoff's rulings, and this is in the appendix, to recall that the government took a very aggressive position that they're not taking before this court that threats to economic coercion as a matter of law had to be explicit, which we admit was not the case here. It was implicit. We think that rule of law is wrong, but I think it's clear. But you think that the district court decided this based on there not being an explicit threat, and you think that was wrong. But I'm looking at what the judge said on JA 81 and 82, and the district court said there are no cases that find that the mere presence of the employer or the CEO could be construed as a threat, implicit or explicit. So that indicates, to me at least, that the district court didn't just focus on there not being an explicit threat, because that's what the court said. I take that a couple of different ways, Your Honor. First, I read that as the judge emphasizing that I didn't have a case, which I admit that I don't, saying that an implicit threat of economic coercion, whether from a CEO or somebody else, constituted a threat to voluntariness. But we also have to consider that passage alongside other comments from the judge, which are cited in the brief, some of them from the exact pages of the joint appendix Your Honor just cited, specifically finding there was no explicit threat to livelihood from the CEO, no explicit threat from the agency. Questioned me about that during oral argument. Over and over again, the judge referred to the lack of an explicit threat, which is exactly the position the government was urging upon him, both in the briefs and in their oral presentation. And that focus on the lack of an explicit threat bled over into the analysis of the totality of the circumstances where Judge Nachmanoff even said, accordingly, after having found there was no explicit threat, he says, accordingly, I find that there was no overbearing of the will. So the ultimate finding was explicitly in the judge's own words, tied to the mistaken position urged by the government that as a matter of law, implicit threats to livelihood can't count. That's why we think that's so significant. I see I've got only one minute left. I'm very sorry I didn't get to talk about the HIPAA issue. Maybe I could just quickly summarize the argument on that. If there's no further questions on suppression. Just very quickly, Your Honors, I think the key thing I want to emphasize in my last 30 seconds with the HIPAA conviction is obviously that's a matter that no court, either this court or anywhere else, has really considered in this context. The definition of individually identifiable health information, I would summarize it as really having two parts. The information has to reasonably identify, one, the person involved to a reasonable degree of specificity, and two, and this is what's critical for this appeal, is either the medical condition or the particular treatment, one or the other, or possibly in different facts, something about how the person- How is that consistent with the text of the statute, which simply requires the information to relate to the past, present, or future physical or mental health of the individual? That seems to me a much broader description than what you want us to adopt here. It all depends on the construction the courts want to put on relate to. There has to be some limiting principle there. Otherwise, it's going to apply to the tickets at the parking garage, at the hospital. It's not this case. It isn't, but in terms of being interpreted of the statute that's consistent with congressional intent, I think if you look at all the district court cases that both parties have cited, the overall thrust of the cases is that this statute needs to be cabined in at least a little bit, and so the interpretation I'm proposing I would submit is consistent with the language of the statute that refers to medical conditions and treatment. The interpretation I'm urging upon the court is that there has to be at least a reasonable degree of certainty or at least some kind of reasonable inference as to either the condition or the treatment. It doesn't have to be both. It can be one or the other, and for the reasons explained in the brief, we don't have either one of those here. Did he conclude that she was being treated for cancer? He, meaning the judge? No, he, meaning your client. Well, of course, our position was always that he didn't do any of it. I thought he'd sent some messages or something to that effect. Well, he was acquitted of that part of it, Your Honor. Well, that's another thing, the evidence. Yeah. No, Your Honor, there is no evidence. I'm talking about the third count. You're taking it to the third count. He was acquitted of that conduct. Well, I know you're saying he was acquitted, but that evidence could carry over to the first two counts, too. It potentially could, but I don't think it resolves the narrow issue here, and I think that it's critical to separate in the analysis what the whole world knows about the late justices' struggle with cancer. She was very public about that. Everybody knows it. We have to separate that from the specific information that was alleged to be accessed here, which tells us next to nothing about the medicals. Didn't the specific information indicate that there were medical services that included oncology? The oncology, but it said the word oncology in the context. It was an administrative section of the hospital that would have covered risk assessment consultations. It would have covered— But what does oncology mean? Oncology has to do with the study and treatment of cancer, but— It's not a leap, then, to say that that's what the justice was there for. It is, though, Your Honor. Something related to, going back to the language of the statute, cancer. I wouldn't agree that that inference lies, because as a matter of common understanding, oncologists do risk assessments for people that maybe have been in a coal mine, let's say, or they have family history. They go to an oncologist to say, what are my chances? They do rule-out work. Someone's having a symptom. They have headaches, and they go to an oncologist to see if it's cancer. There's all sorts of people who go to an oncologist to get certain kinds of treatment. All related to cancer. But it doesn't mean the person has cancer, and that's what the statute says.  Is medical condition or treatment? I see my time's up. Thank you for the time. I appreciate it, Your Honor. Thank you. Thank you. Good morning, and may it please the Court. Lauren Beebe for the United States. Unless the Court has a different preference this morning, I'll go ahead and start with the suppression issue. And I just want to say at the outset that the Court is absolutely right. This is a totality-of-the-circumstances inquiry. We have to accept Judge Nachmanoff's factual findings as true, unless they're clearly erroneous. And this is exactly the correct totality-of-the-circumstances inquiry that Judge Nachmanoff conducted in denying Mr. Russell's motion to suppress. He made a number of factual findings, including explicitly finding that the agents did not ask the CEO to be there. That the CEO chose to be there. That's at the bottom of the— But even accepting all that, the fact is the CEO was there in the room when an appellant was being questioned about a potential crime he had committed while at work on his office computer. That sounds like a pretty coercive, that would make me sweat, type of environment, right? So what's the government's response to that not being unduly, at least implicitly, coercive? And I think opposing counsel used the phrase economic coercion. Sure, absolutely. And we do agree that this implicit economic coercion could be a threat or a sufficient condition of coercion in certain cases. We do not think that's this case. There are many cases holding that kind of an intimidating environment. So what kind of cases? What else would have needed to happen here besides the fact that the CEO of the whole company is sitting there breathing down your neck while the law enforcement is asking you questions about a crime you committed at work? Sure. So actually probably three points. So first of all, I will say just as a factual point, Russell actually committed the crime from his home desktop using his login credentials and everything. So that at the work is a little bit potentially ambiguous. I will also say- Where did he work? From home? He worked at home and also he went- So he was at work. So we don't have to debate about that. Okay. Yeah, sure. I do also want to say, I know there were a couple questions about what Ms. Brigham might have said during the interview, and this is in the record. It's mentioned as an exhibit that my colleague actually submitted to the court with his motion to suppress. And it says that the only thing that Ms. Brigham said during the interview was she wondered aloud what sensitive information could be derived from simply searching for somebody's name. What's the JA site for that? It's referenced at JA 16, and that's part of the motion to suppress brief. It was attached as an exhibit. So that goes back to probably what Chief Judge Diaz was asking. Exactly. And so the only thing, the only evidence we have that Ms. Brigham said anything during the interview was, if anything, friendly to Mr. Russell. And she was kind of opining aloud against that these would be potential HIPAA violations. And she was friendly in that regard. But then the key point I'd say, Judge Thacker, is that the problem is even if the CEO's presence was somehow coercive, there's no evidence whatsoever that there was any coercive police activity. Even if the CEO was coercive, coercive police activity is what's a necessary predicate to finding of involuntariness. And that's what makes this case categorically different than Garrity and the other cases that my colleague attempts to rely upon. All of those cases involved, for example, policemen who were told by their superiors that they would be fired if they didn't cooperate. Or public school teachers, things like that. Let me ask you this, because the FBI had expressly invited this defendant's employer to that interview. And then the employer is sitting there and says something along the lines of, gee, that's a really nice job you have there, Mr. Defendant. It'd be a shame if you lost it by not speaking to these friendly agents. Do you have anything you want to say? Are you suggesting that even though the agents never said anything to him that that wouldn't satisfy, that wouldn't be a coercive environment? So I think that would be a much closer and a much different case. You seem to be saying that so long as the agents don't say anything, they're in the clear. No, I think if the agents were kind of taking advantage and had orchestrated the allegedly coercive environment, so in the hypothetical you were giving where they asked the CEO to be there and kind of capitalized on that, that would be a very different case. Here, there's just no evidence that the agents asked her to be there, even that they wanted her to be there. In the declaration from Special Agent Ford, he actually says they wouldn't have wanted to be, wanted her to be there. They would have rather done it themselves. And that's just... They could have said, sorry, you can't be there. Exactly. But they didn't. And perhaps that was because they thought that maybe she wanted to be there in support to Mr. Russell, in support of her employee. She, from the get-go and throughout this case, even after the trial and everything, she did not fire Mr. Russell. She was very supportive at trial. She testified that she really wanted to believe that he was innocent until proven guilty. She didn't think he was a bad guy. Overall, I think both at the motion to suppress hearing and then at trial, there's nothing to suggest that Ms. Brigham was this kind of intimidating, coercive figure. And as to your hypo too, I know that was discussed actually with Judge Nachmanoff, and he said that would be basically an explicit threat. Even if just the employer had said, hey, what a nice job you've got there. Would be a shame if you lose it after this interview, like let's go into the conference room. That would be a very different situation. So it depends on whether you have a mean boss or a nice boss? Isn't the imprimatur of being the CEO of the entire company sufficiently coercive enough, whether the boss is mean or not? So I think, again, it depends on the course of police activity and whether the agents were kind of facilitating and taking advantage of that. But that is part of the totality of the circumstances. And the thing is here that Judge Nachmanoff found that there was nothing either in their agents and the defendant or the CEO that was either explicitly or implicitly threatening or coercive police activity. He made a factual finding that Mr. Russell was fully capable of making the decision to speak and answer the questions the way that he wished to do. In fact, he felt free to admit incriminating information that violated his company's rules in front of his CEO. You'd think if he was scared that Ms. Brigham was going to fire him, he wouldn't have admitted to these violations, to password sharing, to things like that, that would have been grounds to fire him. And even after those admissions, Ms. Brigham did not fire him. He remained employed. And just overall, viewing the facts in the light most favorable to the government here, we have to defer to Judge Nachmanoff's factual findings. They're not clearly erroneous. And he held that based on the totality of the circumstances, there was no basis to conclude that Mr. Russell's will was overborne. I'm going to change gears here a minute. This prosecution was in Virginia. The medical records were in Washington, D.C. We have rules that require counsel to tell us in briefs about jurisdiction. And that wasn't done here for some reason. But the prosecutor just fell in Virginia for committing crimes on the face of it. Records were in Washington, D.C. Now, the appellant says we have appellant jurisdiction under 1291 of the final order, which is the law. But how did the case get to Virginia? He doesn't explain. And you all don't say anything about it. I don't mention jurisdiction at all. And the rule says that if you don't mention jurisdiction at all, you adopt his position. And we agree. It doesn't say anything about the jurisdiction of the prosecution. The jurisdiction of the appeal is all he's covered. So I'm just wondering why you all abandoned your obligation to tell us what the jurisdiction was in the District of Eastern Virginia. Sure. And I apologize for that oversight. I don't think there was any dispute about jurisdiction. So that's why we didn't do it. We have to have jurisdiction in order to know.  And so the records were accessed remotely. The records were accessed from, I believe, the GW hospital kind of mainframe that was based in D.C. But you don't explain that. You don't explain that. That is your jurisdictional hook. We don't. He was in Virginia when he accessed, when his cat got on the computer. That was in Virginia. And the destruction of records, also the obstruction was in Virginia. And I believe that's a joint appendix. And the court always has an obligation. We do. We're a court of limited jurisdiction. We have to figure out jurisdiction when the lawyers don't help us. And so there's a specific provision in the rules about briefs that say you all are supposed to help us. And I do apologize that. I believe it's in the joint appendix. I could find you the precise number for the indictment. I mean, you got to really find brief on everything except jurisdiction, because I see it. But anyway, I just wanted to point that out. But this happened in Virginia. The accessing is what you're saying.  How about the destruction in Virginia? The interview was at Falls Church, Virginia at the WRTC. The interview was at the WRTC. You'd have been in trouble here maybe today. I think still, because the destruction of property that formed the basis of count one occurred in Virginia, indisputably. We'd still have a basis there, but I agree it might be a closer question. If we can, I'd like to move on a little bit to the HIPAA issue. And I just want to, I think Chief Judge Diaz is absolutely right that the statutory language here is broad. This court in United States versus Spence, the Supreme Court, and Morales v. Trans World nothing in the statute kind of requires this particular treatment or particular condition language that my colleague is trying to read into the statute. And to be clear, the information here included not only Justice Ginsburg's name, gender, birth date, age, the facility, GW Hospital where she was inpatient, but also information for 10 different patient events from 2013 to 2018, each with an identified event type, medical service, and arrival and discharge dates. In addition to the reference to oncology, there were several references to radiology. There was reference to an ambulatory surgery surgical event. Another one of the entries showed an overnight inpatient medical event. And just under any plausible interpretation, there was sufficient evidence for the jury to conclude that that information related to either the provision of healthcare to Justice Ginsburg or to her past or then present physical health or condition. And that's all the statute requires. I also want to point out, I believe Judge King, you asked a question whether Mr. Russell himself had acknowledged that based on the screenshot, you could tell that Justice Ginsburg had cancer. I don't believe that Mr. Russell acknowledged that, but I did want to make the point that my colleague acknowledged just that during the cross-examination of one of the witnesses at trial. He said, and I quote, this is from JA 273 to 274. So it would appear that just based on that screenshot alone, the justice had been receiving treatment from GW for various things related to cancer seemingly since at least 2014. Is that right? And then it shows- You're saying that's what counsel said, but what counsel said is not evidence. Well, so then the witness responded, yes, that's accurate. He said yes. He adopted exactly what the lawyer said. Exactly. And then there was another question- He adopted cancer. And in closing argument, again, he said, you saw the records. She had cancer, period. It was very clear, I think, from Judge Nachmanoff, from counsel's back and forth with the witnesses and throughout trial that there was no dispute that these medical events in history did reveal more, I think, than what's required under statute, something relating to provision of but clearly about the provision of healthcare related to a, and again, I don't think this is necessary, but a specific particular health treatment that she was receiving treatment for at GW facility. I heard Mr. Burnham say that the fact that Justice Ginsburg was suffering from cancer it was publicly known, so that by itself might not be enough. Do you agree that all that the records say or said was that she was being treated for cancer? Would that be a different case or would that still be a violation of the statute? I think that would still be a violation of the statute. Nothing in the statute or what he was charged with turns on what was in the public realm, and especially if you're thinking about particularly sensitive information about Supreme Court justices. I know at one point the court did announce to the public that Justice Ginsburg had cancer. That does not minimize Mr. Russell's conduct in this case or somehow make it accessible or acceptable to then go ahead and try to access the justice's information, private protected records for yourself. It might explain why Mr. Russell was interested in searching for this, but it certainly is not a defense and there's no kind of public information or any defense to the access provision here in HIPAA. I do think it might be a different case if it just said, you know, one thing suggesting she had cancer. The Hartley case in Northern District of Illinois, I think they would definitely say that's still sufficient. I think where the line falls between, you know, plausible reading of the text isn't something that this court has weighed in on. I don't think this is a particularly borderline case, so I don't think we have to really discuss the outer bounds. I think this falls squarely within what the statute contemplates. If I can, I know my colleague didn't mention anything on the cross-examination issue. I did want to point out, I believe Judge King made a comment at the outset that there was bad hearsay evidence introduced. That is not what the issue is about. The issue is a cross-examination ruling where Judge Nachmanoff prohibited one line of testimony that would have elicited Mr. Russell's own prior out-of-court statements. As the district court didn't entirely prohibit that, correct? Exactly. So he prohibited the one line of questioning, maybe the specific question that my colleague had proposed to ask, but he expressly allowed him to question about bias, about during the course of the investigation, and I think this all occurs at JA 382 to 386. It's really clear that Judge Nachmanoff did not prohibit any line of inquiry. He invited the defense to continue their questioning at that time or to recall the witness later in the defense's case-in-chief, and that's our main point. We don't think there was any error, but for the same reasons, that shows harmlessness, and that's just like the cases in Zayad, Smith, Ginwright, where it's repeatedly said that, especially when the defense is complaining of something that they could have solved by calling the witness-in-their-chief, the defense's failure to do so rests on his shoulders, and that does not show any error by the district court. Unless there are any questions on that cross-examination issue or any others, thank you. We'd ask that you affirm. Thank you, Ms. Beebe. Mr. Burnham? Your Honor? A couple of points from my colleague's argument. There's a lot of emphasis on the factual findings that the judge made, and I want to make it clear that we contend that those factual findings actually support us. A lot of the case law, as I alluded to earlier, comes from more rough interrogation techniques, where in this method, the whole point was that the interrogation was supposed to be very civilized, very friendly, very genteel. That's what made it effective. Of course, they weren't going to lock the door or say anything intimidating. That wasn't the strategy. We have to remember, police are very skilled at going right up to the lines that this court and others draw as to what they can do, and they know how to take every advantage they can. God bless them for that. We wouldn't have it any other way. The bottom line here is here's an innovative, subtly coercive technique that's very powerful, and we think the court should be alert to it. Secondly, in terms of the police actions here, just to summarize, my two contentions are that the critical facts are that at the behest of the police, one, the request to Russell didn't come, I keep saying the police, the FBI, the request to Russell didn't come from them. It came from his employer. We don't know who, but it came from the employer. So the police, as I keep saying, used the employer to help make the interview happen. Secondly, in response to some of the discussion on did the CEO ask to be there, was she nice, what she mean, this court, I think, can rely on its many collective years of experience to find that the FBI doesn't have a practice of inviting random people in to interviews. They want to keep those environments very controlled so they come out the way the FBI wants. That the CEO was allowed to be there represents a deliberate investigative decision by the FBI. They didn't have to make. They could have said no. They want us to take judicial notice that that fact that you just recited? Yes, your honor. I think the courts can. We'd be taking judicial notice of something that the district court didn't know. I would submit the district court probably knows it better than any of us. Well, he might know it, but you didn't ask him to take judicial notice. There could easily be. I wouldn't be surprised if there were hundreds of decisions from this court that would justify finding that the FBI normally conducts interviews without third parties being invited to be present. I could submit a 28 J letter with. They normally do a good job. Oh, sure. We all recognize that probably. Certainly, your honor. In terms of the argument about the. Was it a was it a concession that I asked that cross examination question? First of all, there's no cases cited in the government's brief because there aren't any that cross examination question is a concession. But even if there were, as I guess it's the answer that was the concession. Well, the answer was a question. That's right. But the the question specifically refers to the justice. And as I said before, the whole the whole trial took place in the context of her condition, her cancer being publicly known. There was a Supreme Court police officer who testified. And so when I referred to the justice that referred to Justice Ginsburg. And then I would I would submit you can look at the record and say, oh, well, we know she got cancer and look at this record. Well, GW is probably treating it for that. That's totally separate inquiry from what is or is not individually identifiable health information. Your honor, just just asked an interesting question is if it just said she had cancer. Well, I wouldn't even concede that that would count because all cancer means is that if you look up the medical definition, is that some part of one's body has cells in it that are growing too fast. And there's a big difference between, you know, different kinds of cancer. But that isn't even the appropriate hypothetical, because as I tried to argue in my colloquy with with Judge Thacker is we contend that the materials at issue here don't even support an inference that the subject had any form of cancer because we don't know if the treatment was for cancer or for, as I said, risk assessments, rule out work or other types of medical services. Finally, as to the can you before you move to something else, can you tell us what rule you would have us apply in this case that would delineate the parameters of what the statute requires in order to convict? Sure, your honor, that the materials have to have enough to support to either directly inform the reader or support a reasonable inference as to either the condition or the particular type of treatment. So maybe they reveal that someone's having a hysterectomy or maybe they reveal some condition for which a hysterectomy might be one type of treatment. They have to have one or the other. That's the interpretation that I fully concede that this court would be the first court to say that. But I think we can draw some support. I'm sorry, it was your honor. We can draw some support from the available district court opinions that a narrowing construction for the statute is appropriate. This is a very broad statute. It doesn't require the government to prove any kind of bad motive. It just requires unauthorized access. It doesn't have to require the government to prove that the person knew what they were doing was illegal. It could just be a misunderstanding. This is like one of the statutes that Justice Gorsuch writes in his book about federal laws that apply to everything. And I think we see that a little bit in the available district court opinions trying to cabin in the statute a little bit. For example, there are decisions that hold that a person that goes to, let's say, the University of West Virginia hospital website and clicks on 100 different articles on kidney failure and that gets disclosed. That, on the face of it, would seem to be information that relates to an IP address that's very interested in kidney failure at the University of West Virginia. But the courts have held that that doesn't count. That type of information doesn't count, even though on the face of it, it seems like it could. And so I go into that. That has no connection to a particular patient. If the IP address is shared, I would submit that it does, because the IP address goes very often, in many cases, to a particular person. Whose IP address are you talking about? This comes from almost all of the available court opinions deal with these website cases. And so the argument the plaintiffs or civil cases make is that my IP address, being John Smith, and my activity on these hospital websites, including extremely detailed information is talking about the IP address of the person who's doing the searching. Yes, sir. So that doesn't go to Chief Judge Diaz's point. That doesn't go to personally identifiable information about a patient. You're going back to the offender. No, no, no, no. This, in the cases I'm talking about, it is the patient whose IP address is being shared. And sometimes it's in the context of clicking on things like make an appointment. So it's clear that it is the patient. It's clear who the person is. And it's pretty clear. Wait, how is the patient's IP address being shared? In these cases, it's automatically through technology that I couldn't have. No, but I thought it, okay. I couldn't begin to describe it. So it's the patient who's doing the searching. Correct, Your Honor. Okay. And pretty much all of the available district court cases. Okay, so I understand now. It's the patient that's doing the searching in your, what you're talking about. Not an offender doing the searching. Exactly. I'm sorry if that was confusing. And I know that's a distinct factual pattern, but I went into the detail that I did to make the point that I think there is an effort underway in the district courts to cabin in the statute a little bit to give it a more relatively narrow construction than the government is arguing for. Much more along the lines of what I'm suggesting because the statute is so broad. Thank you, Your Honors. Thank you. All right, we're going to come down and greet counsel. Take a short recess before moving on to our third and final case.
judges: Albert Diaz, Robert B. King, Stephanie D. Thacker